*1146 TEXTO COMPLETO DE LA SENTENCIA
La demandante apela de una sentencia dictada por el Tribunal de Primera Instancia el 10 de abril de 2008, notificada el 1 de mayo de 2008. Alega que dicho foro erró al:

“1. dar credibilidad al testimonio de los demandados-apelados cuya falsedad fue obvia.

2. entender que es de aplicación la doctrina de aceptación en finiquito al pago de $20,000, efectuado por la parte demandada-apelada.

3. no aplicar el término de caducidad de dos años que impone el Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción Privada en Puerto Rico. ”

La demanda de título está basada en una reclamación de cobro de dinero. El demandante alegó que fue contratado por los demandados para la construcción de una vivienda. Estos requirieron trabajos adicionales no *1147 contemplados en los planos y especificaciones originales ascendentes a $53,857. El permiso de uso fue expedido el 21 de julio de 1999 y desde entonces el demandante alega que los demandados le adeudan la cantidad reclamada. Dicha parte reclamó el pago de los $53,857 de principal y el interés legal computado a partir del 21 de julio de 1999, las costas y $13,500 por honorarios de abogado.
La demandada negó las alegaciones en su contra y presentó reconvención por defectos y vicios de construcción en la propiedad estimados en $20,000. Además alegó que el demandante alteró especificaciones y detalles contemplados en el plano original para economizar dinero. Este hizo instalaciones de inferior calidad, eliminó equipos y paredes, sin hacer el ajuste de economizarles ese dinero. Estos ajustes fueron estimados en la cantidad de $25,000 y reclamó la cantidad de $100,000 por concepto de angustias mentales, más el pago de las costas, gastos y honorarios de abogado.
El Tribunal de Primera Instancia celebró la vista en su fondo. A tenor con la prueba desfilada y conforme a la credibilidad de los testimonios, concluyó como hechos probados que:

“ 1. En el mes de noviembre de ¡996, el demandante y los demandados se encontraron en una Cena de Acción de Gracias, y hablaron sobre una residencia que los demandados, quienes residían en Estados Unidos, construirían en Puerto Rico.

2. Los demandados habían contratado a un delineante, quien hizo el dibujo del plano. El ingeniero Antonio Figueroa Acosta certificó el plano y gestionó el permiso de construcción en ARPE.

3. Para noviembre de 1996, el proyecto y e.1 plano tenían la aprobación preliminar de ARPE.

4. El demandante solicitó el plano a los demandados para examinarlo. Como no lo tenían en ese momento, acordaron reunirse el próximo sábado. Al recibir el plano, el demandante manifestó a los demandados reconvinientes que adolecía de errores y que él se encargaría de corregirlos.

5. Para esa fecha, los planos de construcción estaban adelantados.

6. Los demandados le propusieron al demandante formalizar por escrito un contrato. El demandante no lo consideró necesario, debido a la amistad que existía entre su cuñado y los demandados reconvinientes.

7. La codemandada y el demandante se reunieron por segunda ocasión para hablar del plano. En esta reunión, el codemandante continuó hablando de los errores que contenía el plano, pero no trajo ni mostró un borrador o un dibujo que reflejara su corrección.

8. El demandante permaneció con el plano desde noviembre de 1997 a abril de 1998. Se mantuvo en comunicación telefónica con la demandante para discutir lo relacionado a los planos, sus alegados errores y los cambios propuestos. Estos fueron aceptados por la demandante.

9. Luego de varios meses de conversaciones, el codemandante le envió a la demandada un fax que contenía un desglose de pagos, cuya suma total ascendía a $229,824 para su aprobación y firma. La demandada no firmó el documento enviado por el codemandante, porque no contenía las modificaciones que habían conversado durante los primeros meses del año 1997.

10. Para abril de 1997, la demandante viajó a Puerto Rico. Para esa fecha, ARPE expidió el permiso de construcción y la demandada acordó con el demandante que edif icara la casa con los cambios ya discutidos por la suma de $229,824. La demandada no habló del contrato escrito porque el demandante insistía en que no era necesario, pues ellos eran como de la familia.

*1148
11.Para esa época hacían 25 años que el demandante no construía, por lo que no tenía el equipo de trabajo “crew de construcción ”. Tampoco tenía los materiales de construcción como paneles, vigas de madera, gatos, camionetas, etc.

12. El demandante contrató a un contratista de nombre Don Gregorio Cosme. Le dijo que los dueños no pagarían más de $175,000 por la obra completa, incluidos los cambios incorporados. El contratista aceptó sin ver el plano por la confianza que le tenía al demandante. Cuando el contratista le preguntó por el contrato escrito, el demandante le dijo que el había suscrito el contrato con los demandados porque éstos se habían tenido que ir a Estado Unidos.

13. Los demandados no financiaron la construcción de la obra, sino que lo hicieron con sus ahorros. La obra fue comenzada y los pagos los hacía la hermana de la demandada. Cuando el demandante recibía el pago no le entregaba nada a cambio, ni recibo, ni certificación o desglose. Incluso tampoco se comunicaba con los demandados reconvinientes.

14. El desglose de los pagos hechos por los demandados al codemandante es el siguiente:

a) 21 de marzo de 1997 $25,000.00

b) 5 de junio de 1997 $35,000.00

c) 9 de octubre de 1997 $50,000.00

d) 15 de enero de 1998 $50,000.00

e) 9 de abril de 1998 $26,000.00

f) 21 de abril de 1998 $24.000.00

Sub-Total $210.000.00

15. En noviembre de 1998, los demandados viajaron a P.R. A esa fecha, la obra estaba sustancialmente completa y sólo le restaba el saldo al codemandante por su trabajo de $20,000. Además de los cambios previamente hablados y discutidos en el año 1997, antes del comienzo de la obra, los demandados observaron en la propiedad otras obras no contratadas.

16. En noviembre de 1998, las partes se reunieron para ver la obra que estaba prácticamente terminada. Lo único que restaba hacer eran los trabajos de ebanistería. A esa fecha, los demandados adeudaban al demandante $20,000 del contrato original. Estos preguntaron al demandante el costo de los trabajos adicionales y acordaron un pago adicional de $20,000 en concepto de la totalidad de esos trabajos adicionales. En virtud de ello, expidieron un cheque por la suma de $40,000. La obra totalizó la cantidad de $250,000.

17. Surge de los testimonios de los demandados, que merecieron entera credibilidad al tribunal, que el demandante, de entrada, le manifestó que no le debían nada por los trabajos adicionales o extra realizados. No obstante aceptó los $20,000.

18. El 28 de junio de 1999, el codemandante juramentó en la certificación del contratista para ARPE, que construyó conforme los planos y certificaciones y bajo el mismo presupuesto estimado originalmente para el permiso de construcción de $98,000. El demandante hizo la certificación a pesar de constarle que hizo cambios 
*1149
a la obra y que su costo fue mucho mayor al estimado.

19. En julio de 1999fue expedido por ARPE el permiso de uso, que fue entregado a los demandados en la visita que hicieron a Puerto Rico.

20. En mayo de 2000, los demandados regresaron a Puerto Rico a su casa nueva. La propiedad estaba sucia. Además faltaban cosas que se habían acordado con el demandante.

21. Como a los tres meses de estar viviendo en la casa, durante una lluvia torrencial comenzó a salir materia fecal por la bañera de la planta baja, proveniente del poz.o séptico. Los techos también comenzaron a colar agua profusamente. En ese momento, la demandante estaba sola en la casa. El salidero de heces era incontrolable al extremo de que salió del baño y ocupó toda la sala.

22. Como consecuencia del desbordamiento de aguas negras, la demandada tuvo que cambiar los muebles de la sala.

23. En diciembre de 2000, se repitió el evento del desbordamiento de aguas negras. Las filtraciones del techo eran de tal naturaleza que las goteras dañaron los colchones de las camas de los cuartos. Las filtraciones más evidentes eran las de la habitación matrimonial.

24. El demandado trató de comunicarse en varias ocasiones con el demandante, pero fue infructuoso. Este último se limitó a enviar a un empleado para que sellara las filtraciones de techo. Esta gestión resultó inútil, pues el techo continuó fütrando agua. Nada se hizo en relación al salidero de aguas negras.

25. Ante la inacción evidente del codemandante, los demandados contrataron una compañía que selló una parte del techo por la suma de $3,200.

26. Los demandados presentaron testimonio pericial del cual surge claramente que las pruebas de percolación utilizadas para el diseño del pozo estaban incorrectas. El testimonio del perito de los demandados demostró que a simple vista podía corroborarse la percolación de la zona. Los pozos tampoco se construyeron conforme aparecían ubicados en el plano. Según el testimonio pericial, un error de construcción provocó los desbordamientos.

27. Para corregir el defecto en el pozo, los demandados contrataron una compañía que hizo las obras de arreglo por $3,000, lo cual incluyó la reparación de la verja por donde entró el equipo pesado que se usó para realizarlas. La bañera de la primera planta se inutilizó y se selló el desagüe para evitar filtraciones futuras en el interior de la casa.

28. A partir de la reunión en noviembre de 1998, el demandante no hizo ningún reclamo a los demandados.

29. Para septiembre de 2002, luego de ocurridos los incidentes relacionados con las filtraciones de techo y con el pozo séptico, la secretaria del demandante se comunicó con el demandado para que pasara por la oficina. Una vez en la oficina, el demandado le preguntó para qué lo habían llamado. El demandante fue impreciso, pero le dijo que no le debían nada y que de hecho ellos le habían pagado de más. La conversación fue en presencia de Don Miguel Román Cruz.

30. Un año después, el 8 de septiembre de 2003, el codemandante envió a los demandados un desglose de deuda por trabajos adicionales ascendente a $74,033, a los cuales le restó los $20,000, quedando un balance de $53,857. ”

*1150 El Tribunal de Primera Instancia dividió la relación entre los litigantes en varios momentos; la formalización del contrato, los cambios al diseño y la obra, el pago, cumplimiento y extinción de las obligaciones, los vicios de construcción y el cobro de dinero por los cambios en la obra. Según dicho foro, la prueba desfilada demostró que las partes acordaron un contrato de arrendamiento de obras, mediante el que los demandados pagarían al demandante la suma de $229,824 por la construcción de su casa. A pesar de la insistencia de los demandados, el contrato no se hizo por escrito, debido a la negativa del demandante, a pesar de su experiencia en la supervisión de obras, para lo cual los informes periódicos, las certificaciones y los contratos, constituyen el uso y la costumbre.
En cuanto a los cambios de diseño y la obra, el tribunal expresó que no tenía duda de que fueron discutidos, acordados y realizados, previo al comienzo de la obra, ya que los demandados demostraron ser muy conscientes de su presupuesto. A diferencia, el tribunal no dio ninguna credibilidad al testimonio del demandante. Éste juramentó en ARPE una certificación, a sabiendas de que lo que estaba certificando era falso. Su posición con los demandantes y con el contratista a quien encomendó la construcción nunca fue clara. El demandante hizo creer a los demandados que sería el inspector de la obra y que corregiría los errores que él imputaba al plano; sin embargo, nunca lo enmendó.
Respecto al cumplimiento del contrato y el pago a satisfacción del demandante, el foro apelado expresó que desde noviembre de 1988, en que se entregó la obra hasta el año 2003, no hubo reclamo alguno de deuda por parte del codemandante a los demandados. No es hasta pasados unos dos años desde que comenzaron a surgir problemas con la estructura y que los demandados reclamaron al demandante, que éste envía una factura, por los trabajos adicionales ascendente a $53,857. Cuando las partes se reunieron en noviembre de 1998, el demandante tenía una reclamación líquida sobre las obras adicionales y su costo. Sin embargo, en esa ocasión manifestó que no se le adeudaba nada. No obstante, los demandados, reconociendo el hecho de que había hecho trabajo extra, le pagaron $20,000 en exceso del precio pactado. El demandante aceptó, por lo que el foro apelado entendió que su aceptación constituyó un acuerdo finiquito que extinguió la obligación.
Además, el foro apelado concluyó que la demandada probó la existencia de una ruina funcional, de su residencia, ocasionada por los vicios y defectos de construcción en los que incurrió el demandante. Según dicho foro, cuando los vicios exceden las imperfecciones normales, la reclamación está enmarcada en el Artículo 1483 del Código Civil, al cual le aplica un término decenal. Por el contrario, si la imperfección no alcanza el grado de ruina funcional, le aplican los términos contenidos en el Reglamento sobre la Construcción de Viviendas Privadas en Puerto Rico de DACO del 16 de septiembre de 1977. La Ley del Oficial de Construcción bajo la cual opera este reglamento establece un término de 2 años de caducidad para hacer la reclamación. En este caso, conforme el testimonio de la codemandada, las filtraciones de techo eran tan profusas que dañaron los colchones de la cama. Además, las filtraciones en el pozo ocasionaban que se inundara de heces fecales la sala de la planta baja de la casa y tuvieron como consecuencia que eliminar la bañera de la planta baja.
Respecto al reclamo por vicios ocultos de la demandada, el tribunal resolvió que su testimonio demostró que las filtraciones del techo, en momentos de lluvia, eran profusas al extremo de que tuvo que eliminar los colchones que se dañaron con el agua. Si bien se le notificó inmediatamente al codemandante, éste no las reparó. Ante su inacción, los demandados optaron por sellar el techo a su costo. Además, las áreas de filtraciones conforme al plano tenían que cubrirse con tejas y el demandante las eliminó. Esta situación, además de un vicio de construcción, representa un incumplimiento con el contrato de construcción y con las especificaciones. El testimonio del perito de la demandada probó que el pozo séptico tampoco fue construido conforme al plano. El resultado de este defecto es que en momentos de lluvia, las aguas negras se desbordan. Como consecuencia, la residencia no es habitable, debido a que el sistema de aguas negras no es funcional. El testimonio pericial no contradicho por la demandante demostró que la falta de percolación del terreno era notable a simple vista. Además, el aumento en el número de habitaciones y el cambio de ubicación del pozo requerían una autorización del diseñador de la estructura, la cual no se obtuvo. Cualquier cambio o posible vicio *1151 debió haber sido notificado a los demandados y corregido por el demandante. Ante estos hechos, el tribunal concluyó que, probada la ruina por vicios ocultos, se presume la culpa del contratista.
En virtud de sus determinaciones de hechos y conclusiones de derecho, el Tribunal de Primera Instancia dictó sentencia declarando NO HA LUGAR la demanda y CON LUGAR la reconvención. En consecuencia condenó a la demandante reconvenida al pago de las siguientes partidas: $3,200 por el costo de corrección parcial de las filtraciones del techo, $3,000 por la reparación del pozo séptico, $650 por los gabinetes del laundry, $1050 por los alféizares o window sills, $2,500 en concepto de los barandales para un total de $10,400. Adicional se impone a la demandante el pago de la suma de $5,000 por los daños y perjuicios, sufrimientos y angustias mentales a favor de la demandada y la suma de $2,500 por los daños y perjuicios, sufrimientos y angustias mentales a favor del demandado. Es de esta sentencia que se acude ante nos.
La apelante cuestiona en primera instancia la apreciación de la prueba y las determinaciones de hechos del foro apelado.
Sabido es que en materia de credibilidad de la prueba, los tribunales apelativos no deben sustituir su criterio por el del foro de instancia, salvo circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. Esta norma obedece a que el Tribunal de Primera Instancia es el foro que tuvo la oportunidad de escuchar los testigos, apreciar su demeanor y, por ende, está en mejor posición de aquilatar la prueba. Colón v. Glamorous Nails Boutique Inc., 2006 J.T.S. 25.
El apelante no ha derrotado la deferencia que merece la sentencia emitida por el Tribunal de Primera Instancia. No ha demostrado que el foro apelado haya actuado con pasión, prejuicio o parcialidad. Por el contrario, la sentencia apelada está basada y fundamentada en el valor probatorio y credibilidad que el tribunal dio a la prueba y a los testimonios presentados ante su consideración. Dicha prueba demostró que el demandante no tiene una causa de acción en cobro de dinero contra los demandados-apelados, como alegó en la demanda. A diferencia, sí quedó demostrado de la prueba desfilada, que la demandada-apelada si tiene una causa de acción contra el demandante por vicios de construcción y daños y perjuicios.
El apelante también cuestiona la aplicación de la doctrina de accord and satisfaction, al pago de los $20,000 hecho por la demandada.
La doctrina de acuerdo y pago (accord and satisfaction) es una norma de derecho común usada para la terminación en corto plazo de diferencias, incertidumbres y mutuas reclamaciones que surgen en la interpretación de un contrato que ha sido adoptada en esta jurisdicción. Su aplicación precisa el concurso de los siguientes elementos: 1) una reclamación ilíquida o sobre la cual exista controversia bonafide, 2) un ofrecimiento de pago por el deudor, y 3) una aceptación de ofrecimiento de pago por el acreedor. El ofrecimiento de pago tiene que ir acompañado por declaraciones y/o actos que claramente indiquen que el pago ofrecido por el deudor al acreedor es en el pago total, completo y definitivo de la deuda existente entre ambos. Esto puede acreditarse por declaraciones o actos que así lo indiquen, inclusive que el acreedor así lo entendió. Hato Rey Electroplating v. Rodríguez, 114 D.P.R. 236 (1983).
En el caso ante nos, quedó probado que el demandante hizo trabajos extras en la propiedad de los demandados, sin informales y sin contar con su consentimiento. Aún así, los demandados preguntaron al demandante en la reunión celebrada en noviembre de 1998, cuál era el costo de esos trabajos. Según el testimonio de los apelados, a quienes el tribunal dio entera credibilidad, el apelante de primera intención dijo que no le debían nada. Pero ellos decidieron pagarle y el apelante aceptó un cheque de $20,000 como pago total y final de los trabajos adicionales que realizó a la propiedad. No es hasta el año 2003, después de todos los reclamos de los demandados por las filtraciones en los techos y en el pozo séptico, que el demandante les envío una carta cobrándole por los trabajos adicionales hechos a la propiedad.
*1152 Por último, el apelante cuestiona la aplicación del término decena, a las reclamaciones hechas por la demandada en su reconvención.
El Artículo 1483 del Código Civil de Puerto Rico, 31 L.P.R.A. 4124, establece la responsabilidad del contratista por vicios de construcción que provoquen la ruina de un edificio. El contratista de un edificio que se arruinase por vicios de construcción responde por los daños y perjuicios, si la ruina tuviere lugar dentro de los diez años, contados desde que concluyó la construcción.
No obstante, para que se aplique ese plazo que es de caducidad, es necesario que el vicio de construcción sea de tal magnitud que pueda considerarse un defecto arruinante. Para que un defecto se considere ruina, no es necesario que se comprometa la solidez o estabilidad de la estructura. Sí es necesario que el defecto sea de tal magnitud que afecte severamente el uso y disfrute del edificio. El Tribunal Supremo ha expresado que un edificio se encuentra en ruina cuando los vicios de que adolece: 1) amenazan la seguridad pública o estabilidad del edificio, 2) le causan perjuicio grave al dueño, 3) tornan la obra en impropia para el uso a que se le- destina, y 4) exceden las medidas de las imperfecciones que cabe esperar razonablemente en una construcción. La presencia de cualquiera de estas situaciones en una constmcción produce un estado de mina funcional. El hecho de estar la estmctura en ese estado, no implica que estén amenazados de mina sus elementos vitales. No obstante, se afecta severamente su utilización y disfrute. Pacheco v. Estancias, 160 D.P.R. 409 (2003).
Una vez el dueño del edificio presenta prueba que demuestra que los vicios de constmcción que sufre el edificio provocan algunos de los tipos de mina establecidos por la jurisprudencia, se activa una presunción de culpa o negligencia en contra del contratista que tuvo a su cargo la constmcción. Le corresponde entonces al contratista presentar prueba que demuestre la inexistencia de la mina o que ésta no fue causada por su negligencia. Por lo tanto, se trata de una presunción iuris tantum, lo cual tiene que ser rebatida por la parte en contra de la cual ésta opera; o sea, el contratista. Si no presenta pmeba para rebatir el hecho básico que da lugar a la presunción, el juzgador está obligado a dar por probado el hecho presumido. Pacheco v. Estancias de Yauco, supra; Muñoz Rodríguez v. Ten General Contractors Palmas Reales, S.E., 2006 J.T.S. 42.
Además del Artículo 1483, existen otras leyes especiales que rigen el negocio de la constmcción. La Ley del Oficial de Construcción reglamenta y fiscaliza el negocio de viviendas privadas en Puerto Rico. Esta ley confiere jurisdicción a DACO para entender en querellas presentadas por cualquier comprador u optante de una propiedad, cuando un constructor o urbanizador haya incurrido en cualquiera de las prácticas prohibidas por el estatuto. El Artículo 11 establece un término de caducidad de 2 años a partir del otorgamiento de las escrituras para las acciones, por vicios o defectos de construcción, excepto las que cualifiquen bajo la sección 4124 del título 31. (17 L.P.R.A. see. 511)
La demandada-apelada, mediante los testimonios y la evidencia presentada, probó que las filtraciones de techo y del pozo séptico, ocasionadas por los vicios de constmcción incurridos por el apelante, constituyen una mina funcional que convirtió su residencia en un lugar no habitable.
Por todas las razones antes expuestas y de conformidad al derecho citado, se confirma la sentencia apelada.
Lo acordó el Tribunal y lo certifica la Secretaria.
Leda. Dimarie Alicea Lozada Secretaria del Tribunal de Apelaciones